UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

RUSSELL BARNETT FORD OF            )
TULLAHOMA, INC.,                   )
                                   )
        *Plaintiff/Counter-Defendant*, )
                                   )        No. 4:18-CV-30
v.                                 )
                                   )        Judge Collier
H&S BAKERY, INC. d/b/a H&S BAKERY  )        Magistrate Judge Steger
and JONBER ASSOCIATES, INC.,       )
                                   )
        *Defendants/Counter-Plaintiff.* )

# M E M O R A N D U M

This dispute arises out of a commercial-vehicle sale gone awry. Unbeknownst to the seller and buyer, a third party hacked into the seller's email account and sent fraudulent wiring instructions to the buyer. The buyer then wired the purchase money to the hacker's account, instead of the seller's account. The Plaintiff seller, Russell Barnett Ford of Tullahoma, Inc. ("Plaintiff"), has sued the two parties it characterizes as the buyer, seeking to recover the purchase money. (Doc. 1 [Compl.].) Defendants, H&S Bakery, Inc. d/b/a H&S Bakery ("H&S Bakery") and Jonber Associates, Inc. ("Jonber"; collectively with H&S Bakery, "Defendants"), have moved for partial dismissal of the Complaint. (Doc. 22.) H&S Bakery moves to dismiss all of the claims against it on the grounds that it was not a party to the sale. Jonber concedes it was the buyer and moves to dismiss only the tort claims against it. Plaintiff has responded in opposition to the motion (Doc. 28), and Defendants have replied. (Doc. 29.) For the reasons set out below, the Court will **GRANT** the motion for partial dismissal.

## I.    BACKGROUND[1]

Plaintiff operates a vehicle dealership in Tullahoma, Tennessee. (Doc. 1 [Compl.] ¶ 7.) H&S Bakery operates a bakery and delivery service in Baltimore, Maryland. (*Id.* ¶ 9.) In 2016, Plaintiff contracted with H&S Bakery for the construction and sale of seven bread trucks. (*Id.* ¶ 12.) H&S Bakery received the trucks in February 2017 and paid Plaintiff by check. (*Id.*)

In December 2017, Bob Trewyn, an employee of Plaintiff, prepared a Customer Proposal (the "Proposal") to H&S Bakery for the construction and sale of forty-eight additional bread trucks for $55,433.70 per vehicle, or a total of $2,660,817.60. (*Id.* ¶¶ 8, 14–15; Doc. 1-1 [Proposal] at 9.) The bottom of each substantive page of the Proposal contains the following disclaimer: "Prices and content availability as shown are subject to change and should be treated as estimates only. Actual base vehicle, package and option pricing may vary from this estimate because of special local pricing, availability or pricing adjustments not reflected in the dealer's computer system." (Doc. 1-1 [Proposal] at 4–8.)

The Proposal states that it was prepared for Chuck Paterakis of H&S Bakery. (*Id.* at 1.) Paterakis, who is Vice President of Logistics for H&S Bakery, signed the Proposal on January 10, 2018. (Doc. 1 [Compl.] ¶¶ 10, 15; Doc. 1-1 [Proposal] at 9–10.) Paterakis asked, however, that the sale be made to H&S Distribution LLC ("H&S Distribution"), not H&S Bakery. (Doc. 1 [Compl.] ¶ 16.) The name and address of H&S Distribution are handwritten on the Proposal. (*Id.*; Doc. 1-1 [Proposal] at 9.)

---

[1] This summary of the facts accepts all of the factual allegations in Plaintiff's Complaint as true, *see Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009), except where the exhibits to Plaintiff's Complaint contradict the allegations in the Complaint, *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013).

Plaintiff and H&S Distribution later agreed to split the transaction into two deliveries of twenty-four vehicles each in April and May of 2018 (the "April Purchase" and "May Purchase," respectively). (Doc. 1 [Compl.] ¶ 17; Doc. 1-4 [April 2, 2018 Letter].) This was confirmed in a letter from Trewyn addressed to Paterakis for H&S Distribution. (Doc. 1-4 [April 2, 2018 Letter].) The per-vehicle price was $55,733.70, three hundred dollars more per vehicle than had been stated in the Proposal. (*Compare* Doc. 1-4 [April 2, 2018 Letter] *with* Doc. 1-1 [Proposal] at 7.) Each of the two purchases was to be for $1,337,608.80. (Doc. 1 [Compl.] ¶ 17.)

Trewyn met with Paterakis in Baltimore on April 4, 2018. (*Id.* ¶ 21.) On that day, they executed purchase documents for each of the forty-eight trucks, consisting of a Bill of Sale, an Automobile Sales Order, a National Vehicle Service Contract Application, two Certificates of Origin, and an Odometer Disclosure Statement for each vehicle. (*Id.* ¶¶ 18, 21 & n.2.)

On April 6, 2018, Trewyn received an email from Eric Hiemstra, Corporate Finance Manager for H&S Bakery, asking that the purchase documents be changed to show the purchaser as Jonber, rather than H&S Distribution. (*Id.* ¶¶ 11, 22.) Hiemsta explained to Trewyn that Jonber "is the leasing company who will be leasing the trucks to Independent Operators or [if] we do not go [with the] independent operator model[,] they will then be leased to H&S Distribution, LLC. or. [sic] That is why we have the distinction." (*Id.* ¶ 22; Doc. 1-7 [April 6, 2018 Email from Hiemstra to Trewyn].) In compliance with this request, Plaintiff prepared new purchase documents identifying Jonber as the purchaser, shipped the documents to H&S Bakery, and received them back executed by Paterakis on behalf of Jonber. (Doc. 1 [Compl.] ¶¶ 24–26; Doc. 1-2 [April Purchase Documents]; Doc. 1-3 [May Purchase Documents].)

The parties originally expected payment to be by check (*see* Doc. 1 [Compl.] ¶¶ 17-18), as it had been for the 2017 sale to H&S Bakery (*see id.* ¶ 12). The day before the meeting in Baltimore, however, Paterakis called Trewyn and told him a check would not be ready in time for the meeting. (*Id.* ¶ 18.) Instead, Paterakis asked to make the payment by wire transfer after the purchase documents were signed. (*Id.*) Paterakis sent an email to Trewyn the same day, with an H&S Bakery signature line, asking Trewyn to "resend the wiring so we can send the money Friday." (*Id.* ¶ 19; Doc. 1-1 [Apr. 3, 2018 Email from Paterakis to Trewyn].) Trewyn emailed wire instructions for Plaintiff's bank, Southern Community Bank ("Southern Community"), to someone at H&S Bakery on an unspecified date. (Doc. 1 [Compl.] ¶ 20; Doc. 1-6 [Wire Instruction Form without cover email].)

Hiemstra forwarded Trewyn's wiring instructions to The Columbia Bank ("Columbia") in Hagerstown, Maryland. (Doc. 1 [Compl.] ¶ 27.) When Columbia tried to wire the $1,337,608.80 for the April Purchase to Plaintiff's account at Southern Community, Columbia received an error message that the beneficiary information was not sufficient. (*Id.* ¶ 32.) Hiemstra emailed Trewyn about the error and forwarded Columbia's email as well, asking Trewyn to pencil in the changes on the form so he could resubmit it. (*Id.* ¶¶ 32–33; Doc. 1-10 [Apr. 9–11 Email Chain].)

Meanwhile, without Trewyn's or Plaintiff's knowledge, a hacker was intercepting some of Trewyn's emails. (Doc. 1 [Compl.] ¶ 28.) When Hiemstra emailed Trewyn about the need to correct the wire instructions, the hacker stopped the email from entering Trewyn's inbox and then sent false responses to Hiemstra, purporting to be from Trewyn. (*Id.* ¶¶ 33–34.) The hacker sent wiring instructions for the account of "National Equipment & Trucking" at SunTrust Bank in Atlanta, Georgia, with different account and routing numbers from the first set of instructions. (*Id.*

¶¶ 33–36; Doc. 1-11 [Hacker Wire Instructions].)  The fraudulent instructions were on a page with fabricated letterhead for "Russell Barnett Automotive Family D.B.A.: Russell B. National Equipment & Trucking."  (Doc. 1-11 [Hacker Wire Instructions].)

Hiemstra did not call Trewyn to verify the information.  (Doc. 1 [Compl.] ¶ 38.)  Hiemstra sent the hacker's wire instructions to Columbia, and Columbia initiated a transfer of $1,337,608.80 to the hacker's account on April 9, 2018.  (*Id.* ¶¶ 37, 39.)  Hiemstra emailed Trewyn to provide a status update on the wire transfer on April 10; Trewyn did not receive this email.  (*Id.* ¶ 40.)

On April 11, 2019, having not received any of Hiemstra's emails about the problem with the wire instructions, Trewyn called Hiemstra to ask when Plaintiff would receive payment.  (*Id.* ¶ 41.)  Hiemstra told Trewyn the wire transfer had already been completed.  (*Id.*)  Hiemstra also told Trewyn about the emails that had purportedly gone to and from Trewyn over the previous two days.  (*Id.*)  This led to the discovery of the hacker's interference in Trewyn's email account.  (*See id.*)

The hacker's account at SunTrust has been frozen.  (*Id.* ¶ 42.)  Thirteen of the vehicles from the April Purchase were delivered to H&S Bakery, but H&S Bakery agreed to allow Plaintiff to repossess the vehicles.  (*Id.* ¶ 43.)  Plaintiff stopped delivery of the remaining eleven vehicles.  (*Id.* ¶ 44.)  The twenty-four vehicles are the subject of a Temporary Restraining Order (Doc. 41), a motion for preliminary injunction (Doc. 39), and a motion to vacate the Temporary Restraining Order (Doc. 43).[2]

---

[2] The parties agreed to complete the May Purchase on May 3, 2018.  (Doc. 1 [Compl.] ¶ 45.)  Jonber delivered a certified check for $1,337,608.80 to Plaintiff for the May Purchase, and Plaintiff delivered the vehicles.  (*Id.*)

Plaintiff asserts causes of action for breach of contract and negligence against H&S Bakery and Jonber. (Doc. 1 [Compl.].) H&S Bakery moves to dismiss the contract claims against it, and both Defendants move to dismiss the tort claims against them. (Doc. 22.)

## II.    STANDARD OF REVIEW

A party may move to dismiss a claim for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In ruling on such a motion, a court must accept all of the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Hill v. Blue Cross & Blue Shield of Mich.*, 49 F.3d 710, 716 (6th Cir. 2005)). The court is not, however, bound to accept as true bare assertions of legal conclusions. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In deciding a motion to dismiss under Rule 12(b)(6), a court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.* at 678. Plausibility as explained by the Court "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679

(quoting Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

If a party presents matters outside the pleadings in connection with a motion to dismiss, the court must either exclude those matters from consideration or treat the motion as one for summary judgment. Fed. R. Civ. P. 12(d). Documents attached to pleadings are considered part of the pleadings for all purposes, however, Fed. R. Civ. P. 10(c), and a court's consideration of documents referred to in a complaint and integral to the claims does not convert a motion to dismiss into a motion for summary judgment. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007). Where a written instrument attached to a pleading contradicts allegations in the pleading, a court must credit the instrument, rather than the allegations. *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013) (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)).

## III.  DISCUSSION

The Court first addresses H&S Bakery's motion for dismissal of the contract claims against it. H&S Bakery argues that dismissal of Plaintiff's contract claim against it is appropriate because H&S Bakery did not enter into a contract with Plaintiff. (*See* Doc. 22 at 1.) The Court agrees with H&S Bakery on this point, and also finds that Plaintiff's request to pierce the corporate veil should be denied. The Court next turns to Plaintiff's tort claims. Defendants make four arguments for dismissal of Plaintiff's tort claims. First, they argue Tennessee's enactment of the Uniform Commercial Code (the "UCC") displaces Plaintiff's common-law negligence claim. Second, they argue the economic-loss doctrine bars the claims. Third, they argue Tennessee does not impose a

duty on a party to take any action to protect someone else unless the party's own wrongful conduct created the risk of harm.  Fourth, H&S Bakery argues there are no plausible allegations in the Complaint that H&S Bakery, as a non-party to the contracts, had a duty to Plaintiff regarding payment for the April Purchases or caused any damages to Plaintiff regarding the April Purchases. The first argument disposes of Plaintiff's tort claim against Jonber, and the fourth argument disposes of Plaintiff's tort claim against H&S Bakery.  The Court therefore need not address the other arguments.

Before proceeding, the Court notes the parties do not dispute the choice of law in this case, and have both applied Tennessee law.  (*See* Doc. 23; Doc. 28.)  Under the Court's analysis, it was correct to do so.[3]

### A.     Contract Claims Against H&S Bakery

H&S Bakery argues the Complaint lacks any plausible allegations that H&S Bakery entered into a contract with Plaintiff for the April Purchase.  (Doc. 23.)  It argues that the Bills of Sale demonstrate that the contracts were between Plaintiff and Jonber, and the Proposal, which did involve H&S Bakery, was merely an offer to negotiate.  (*Id.*)  Therefore, H&S Bakery argues, Plaintiff has not stated a contract claim against it on which relief may be granted.  (*Id.*)

---

[3] "A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules." *Carbon Processing and Reclamation, LLC v. Valero Marketing and Supply Co.*, 823 F. Supp. 2d 786, 801 (W.D. Tenn. 2011); *see Klaxon Co. v. Stentor Elec. Mgf. Co.*, 313 U.S. 487, 496 (1941).  In the absence of a choice of law provision, as in the instant case, "Tennessee's Uniform Commercial Code applies 'to transactions bearing an appropriate relation to the state of Tennessee.'"  *Carbon Processing*, 823 F. Supp. 2d at 801 (quoting Tenn. Code Ann. § 47-1-301(b)).

## 1.    The Contracts Were the Bills of Sale

In Tennessee, whether a contract is express or implied, written or oral, "an enforceable contract must result from a meeting of the minds in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and must be sufficiently definite to be enforced." *Jones v. LeMoyne-Owen Coll.*, 308 S.W.3d 894, 904 (Tenn. Ct. App. 2009) (quoting *Thomas v. Hensley*, 136 S.W.3d 925, 929-30 (Tenn. Ct. App. 2003)).  The Tennessee Code provides:

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
> (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
> (3) Even though one (1) or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Tenn. Code Ann. § 47-2-204 (West 2019).  Without mutual assent (*i.e.* agreement), there is no contract.  *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 386 (Tenn. 1996).  To determine mutual assent, the court must examine the intention of the parties.  *Murray v. Tenn. Farmers Assur. Co.*, No. M200800115COAR3CV, 2008 WL 3452410, at *2 (Tenn. Ct. App. Aug. 12, 2008).  When examining intent, the court must look to the writing first and then to the circumstances surrounding the writing.  *Id.*

The exhibits to the Complaint demonstrate that the enforceable contracts were the Bills of Sale.  (*See* Doc. 1-2.)

Looking first to the writing, each Bill of Sale contains definite terms, such as the total sale price, payment method, and payment date.  (*See id.*)  The Bills of Sale appear to result from a

meeting of the minds based upon sufficient consideration and definite terms. (*Id.*) There is no allegation or evidence submitted in the Complaint that the Bills of Sale resulted from fraud or undue influence, or that enforcement of the Bills of Sale would be against public policy. (*See* Doc. 1 [Compl.].)

The circumstances surrounding the Bills of Sale also support the conclusion that there was a meeting of the minds immediately following the execution of the Bills of Sale. The Bills of Sale were the last signed documents exchanged between the parties before payment was attempted for the April Purchase. (*See* Doc. 1 [Compl.] ¶¶ 26-31.) Payment for the April Purchase was expected by Plaintiff immediately following the execution of the Bills of Sale, and payment was attempted multiple times. (*Id.* ¶¶ 31-39.) Finally, thirteen of the original twenty-four trucks were delivered before the wiring instructions were discovered as fraudulent. (*See id.* ¶ 43.)

The Court acknowledges that a contract may be contained in multiple documents. *See Springfield Tobacco Redryers Corp. v. City of Springfield*, 293 S.W.2d 189, 197 (1956). Any number of documents may constitute a contract, so long as the documents are connected, either physically or by reference. (*See id.*) There is no evidence that the Proposal and the Bills of Sale were physically attached. (*See* Doc. 1-1 [Proposal]; Doc. 1-2.) Additionally, there is no reference to the Proposal in the Bills of Sale, or vice versa. (*Id.*) Therefore, the Bills of Sale and the Proposal are separate documents and do not constitute a single, unified contract. As such, the documents are evaluated independently of one another to determine whether either the Bills of Sale— containing twenty-four separate Bills—or the Proposal constitute enforceable contracts under Tennessee law.

## 2. H&S Bakery Was Not a Party to the Bills of Sale

H&S Bakery is not mentioned in any document contained within the Bills of Sale. (*See* Doc. 1-2.) Each Bill of Sale is printed on Plaintiff's letterhead (*see* Doc. 1-2), and prepared by Plaintiff (Doc. 1 [Compl.] ¶ 24). Trewyn, who serves as the "Commercial Account Manager" for Plaintiff (*id.* ¶ 8), is identified as the "Salesperson." (*See* Doc. 1-2.) On each Bill, "JONBER ASSOCIATES, Inc." is printed next to "SOLD TO:" and identified as the "Purchaser." (*Id.*) "JONBER ASSOCIATES, Inc." is also identified as the "BUYER OR TRANSFEREE" on each Tennessee Department of Revenue Odometer Disclosure Statement attached to every Bill of Sale. (*Id.* at 6.)

Plaintiff argues, however, that H&S Bakery is a party to the Bills of Sale. (Doc. 28 at 4; *see* Doc. 1 [Compl.] ¶ 47.) This could only be possible if the Court were to look to parol evidence that contradicts the text of the Bills of Sale, such as language contained in the Proposal or the parties' course of dealing.

Tennessee caselaw has a long history of forbidding the use of evidence which would violate the parol evidence rule. *See Individual Healthcare Specialists v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 695 (Tenn. 2019). The parol evidence rule encompasses both oral and written evidence of pre-contract negotiations that contradicts or alters the terms of the contract. *Id.* at 696. The parol evidence rule is most restrictive when the contract is fully integrated, meaning it is the exclusive and complete record of the parties' agreement. *Id.* "When a contract is fully integrated, the parol evidence rule does more than prohibit the use of pre-contract negotiations to contradict the contract's terms; it also prohibits the use of pre-contract negotiations within the

scope of the agreement in a way that would supplement or limit its terms, even if that evidence is consistent with the terms of the contract." *Id.* (emphasis omitted).

At the bottom of each Automobile Sales Order attached to each Bill of Sale, there is an integration clause directly above the purchaser's signature that reads:

> I have read the matter printed on the back hereof and agree to it as a part of this order the same as if it were printed above my signature. The front and back of this order comprise the entire agreement pertaining to this purchase, and no other agreement of any kind, verbal understanding or promise whatsoever, will be recognized. Receipt of a copy of this order is hereby acknowledged.

(Doc. 1-2.) This clause indicates that the Bills of Sale were fully integrated contracts. As mentioned above, the contracts were drafted by Plaintiff and signed by Jonber, and there is no mention of H&S Bakery within the four corners of the written documents. (*See* Doc. 1-2.) Adding a party to the Bills of Sale would directly contradict the terms of the contracts as written, and would violate the parol evidence rule.

It is also worth noting that even if this Court were to consider parol evidence in this case, the course of dealing between Plaintiff and H&S Bakery was relatively short. The course of dealing consisted of a single transaction that occurred between 2016 and 2017 for seven bread trucks. (Doc. 1 [Compl.] ¶ 12.) In addition, while Plaintiff alleges H&S Bakery was a party to the Bills of Sale before Jonber "became a party . . . at the eleventh hour," (Doc. 28 at 4), it appears that H&S Distribution was the only party to the Bills of Sale, (Doc. 1 [Compl.] ¶ 17), before Plaintiff voluntarily altered the contract and substituted Jonber (Doc. 1 [Compl. ¶ 22).[4] Finally,

---

[4] The Complaint does not directly allege that H&S Distribution was the buyer in the first set of purchase documents. The only reasonable inference from the Complaint as a whole, however, is that H&S Distribution was the named buyer for which Jonber was later substituted.

the course of dealing also reflects that Plaintiff voluntarily agreed to release the buyer under the first set of purchase documents, and enter into new agreements solely with Jonber. (Doc. 1 [Compl.] ¶¶ 24–26; Doc. 1-2 [April Purchase Documents]; Doc. 1-3 [May Purchase Documents].) If Plaintiff had not been willing to contract with Jonber, and only Jonber, it should have sought to enforce the earlier contracts without altering the buyer.

### 3. The Proposal Does Not Stand as a Separate Contract between Plaintiff and H&S Bakery

Next, the Court must determine whether the Proposal stands as a separate, enforceable contract between Plaintiff and H&S Bakery.

Looking first to the writing, the bottom of pages four through ten read, "[p]rices and content availability as shown are subject to change and should be treated as estimates only. Actual base vehicle, package and option pricing may vary from this estimate . . . See salesperson for the most current information." (Doc. 1-1 [Proposal] at 4–10.) In fact, the final sale price in the Bills of Sale was $55,733.70, (Doc. 1-2), while the sale price quoted in the Proposal was $55,433.70. (Doc. 1-1 [Proposal] at 9.) Additionally, Plaintiff's employee Trewyn stated in a message attached to the Proposal that he hoped the Dealership's products line-up and customer service would enhance Plaintiff's experience "should" Plaintiff "decide to buy a vehicle[,]" and that he hoped the information would assist Plaintiff "in making a more informed decision." (*See* Doc. 1-1 at 2.) Given the indefinite nature of the figures and the language located in both the Proposal and

---

Despite the Complaint's and its exhibits' references to H&S Distribution, Plaintiff's response omits all references to H&S Distribution.

Trewyn's message, the Court concludes that the Proposal was understood by both parties to be a price quotation.

"Typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *Dyno Constr. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (quoting *White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1190 (8th Cir. 1999)). "[A] price quotation may suffice for an offer if it is sufficiently detailed and 'reasonably appear[s] from the price quotation that assent to that quotation is all that is needed to ripen the offer into contract.'" *Id.* (quoting *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc. of Ill.*, 635 F. Supp. 1281, 1284 (N.D. Ill. 1986)).

The *Dyno* court stated that while the document in question contained prices, quantities, and descriptions of various materials, the document lacked important details such as the "place of delivery, time of performance, or terms of payment," and therefore did not constitute a contract as a matter of law. *See* 198 F.3d at 573-74. The court also noted that the word "estimate" was printed on the top of the document in question, and instructed the defendant to "[p]lease call" for further assistance. *See id.* The court held the language to be indicative of "an invitation to engage in future negotiations rather than an offer to enter into a contract." *Id.* Finally, the court explained that the plaintiff's voluntary signature on subsequent sales documents for the same transaction provided evidence that the plaintiff did not understand the original document to be a binding contract. *Id.*

The Proposal sent by Plaintiff lacks each of the details noted in *Dyno*, including place of delivery, time of performance, and terms of payment. (*See* Doc. 1-1 [Proposal].) The Proposal also includes language similar to the language used in *Dyno*, such as "estimate" and "subject to

change." *Id.* The Proposal instructs H&S Bakery to "contact a salesperson for the most current information," and in fact, the information *was* changed when the Bills of Sale were prepared by Plaintiff. *Id.* Finally, as in *Dyno*, Plaintiff signed subsequent sales documents. (*See* Doc. 1-2; Doc. 1-3.) Therefore, it is not plausible that Plaintiff or H&S Bakery believed the Proposal was an enforceable contract at the time of its preparation, and as such, it should not be held as an enforceable contract now.

Overall, the Court finds that the Complaint lacks any plausible allegations that H&S Bakery entered into a contract with Plaintiff for the April Purchase.

### 4. Plaintiff's Request to Pierce the Corporate Veil

Plaintiff next argues the Court should pierce the corporate veil between Jonber and H&S Bakery to allow Plaintiff to pursue a contract remedy against both entities. In its reply, Plaintiff alleges that H&S Bakery and Jonber did not "maintain corporate separateness." (Doc. 28 at 6.) As such, Plaintiff requests the Court "allow the parties to conduct limited discovery into the corporate structure of the Defendants so that the Court and the parties have all available facts before them to adequately determine if the corporate veil should be pierced." (*Id.*) As evidence of an improper corporate identity, Plaintiff alleges H&S Bakery and Jonber "shared employees, shared the same business location, and failed to maintain an arms-length relationship among the related entities." Plaintiff points to the Proposal and purchase documents for support. (*See* Doc. 1-1; Doc. 1-2; Doc.1-3.)

Tennessee courts are cautious to pierce the corporate veil, as there is a "presumption of corporate regularity." *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 829 (Tenn. Ct. App. 2012) (quoting *Schlater v. Haynie*, 833 S.W.3d 919, 925 (Tenn. Ct. App. 1991)). "There is a

presumption that a corporation is a distinct entity, separate from its shareholders, officers, directors or affiliated corporations, and the party wishing to negate the existence of such separate entity has the burden of proving facts sufficient to justify piercing the corporate veil." *Schlater*, 833 S.W.3d at 925 (quoting 18 C.J.S. Corporations, § 18, p. 290). Mere dominance of a corporation by another corporation or its shareholders is insufficient to justify piercing the corporate veil. *Edmunds*, 403 S.W.3d at 831; *see also Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 439 (Tenn. Ct. App. 2008).

The Supreme Court of Tennessee has held that three elements are required to pierce the corporate veil between a corporation and its subsidiary:

> (1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

> (2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Cont'l Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979); *see also Edmunds*, 403 S.W.3d 812, 829 (Tenn. Ct. App. 2012) (citing three elements required by *Cont'l Bankers*); *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985) (same). Subsequent decisions have reinforced the idea that there must be a finding that the second element has been alleged—the corporate form must have been used to commit fraud or wrongdoing. *See Cambio Health Solutions, LLC et al. v. Reardon*, 213 S.W.3d 785, 790 (Tenn. 2006) (holding plaintiff must "show that a shareholder exercised complete

control over a subsidiary and used that control to commit fraud or a wrong"); *see also Se. Tex. Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 679 (6th Cir. 2006) (stating Tennessee law requires plaintiff allege fraud or injustice resulting from misuse of the corporate form).

When considering whether to pierce the corporate veil, courts will consider whether the corporation was used to commit fraud or wrongdoing, as stated above, but must also consider:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984); *see also Marshall v. Jackson*, No. M2007-01764-COA-R3-CV, 2008 WL 5156312, *6 (Tenn. Ct. App. Dec. 8, 2008) (citing the factors and noting they are commonly referred to as *Allen* factors). Generally, every *Allen* factor does not need to be met, nor will any single *Allen* factor be dispositive in determining whether to pierce the corporate veil. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 215 (Tenn. 2012).

While Plaintiff does allege a combination of *Allen* Factors, Plaintiff does not make any allegation that Jonber's corporate form was used to commit fraud or wrongdoing, or that fraud or wrongdoing led to the injury from which Plaintiff seeks relief. (*See* Doc. 28 at 4-6.) Although Jonber may or may not possess the amount of money Plaintiff seeks to recover in this case, "a corporate entity may not be disregarded simply because it stands as a bar to a litigant's recovery of property." *Edmunds*, 403 S.W.2d at 833 (citing Am. Jur. 2d. Corporations § 47). As such,

Plaintiff's request for discovery to pierce the corporate veil will be denied for lack of a plausible allegation of fraud or wrongdoing.

### B. Tort Claims Against Jonber

Moving next to Plaintiff's tort claims, Jonber argues that Article 2 of Tennessee's enactment of the UCC, Tenn. Code Ann. §§ 47-2-101 *et seq.* (the "Tennessee UCC"), displaces Plaintiff's negligence claim.[5]  Jonber concedes that no Tennessee court has addressed whether Article 2 displaces common-law claims of negligence in the sale of goods, but argues that the general principles that led the Tennessee Court of Appeals to find that Articles 3 and 4 displace common-law claims also apply to Article 2.  (Doc. 23 at 11.)

Where Jonber sees the displacement glass as half full, Plaintiff sees it as half empty.  Plaintiff argues there is no UCC displacement as to Article 2 because, in Tennessee, UCC displacement "has only been applied in limited circumstances when Articles 3 and 4 of the UCC are implicated."  (Doc. 28 at 10.)

The Tennessee Court of Appeals has explained the reasoning behind UCC displacement as follows:

> The drafters of the UCC set out to preserve and, where necessary, clarify and conform the law merchant with modern commercial practice.  The Code does not purport to codify the entire body of law affecting the rights and obligations of parties to commercial transactions.  Thus, unless "displaced" by particular provisions of the UCC, other principles of law and equity that are consistent with the UCC remain valid.

---

[5] H&S Bakery makes the same argument.  Plaintiff, however, argues in its response that "if it is determined that H&S Bakery was not a party to the contract[,] then[] Defendants' arguments regarding . . . UCC displacement would not apply to H&S Bakery."  (Doc. 28 at 11.) Defendants do not address the point in their reply.  (*See* Doc. 29.)  Because the Court has concluded that H&S Bakery was not a party to the contract and Plaintiff has no contract claim against H&S Bakery, the Court does not consider the UCC displacement argument as to H&S Bakery.

Even though the UCC does not supplant all the law applicable to commercial transactions, it is still the primary source of the commercial law rules for the areas it governs because it represents the considered choices of its drafters and of the Tennessee General Assembly about the appropriate policies to be furthered in the transactions it covers. The purposes and policies reflected in the UCC include (a) simplifying, clarifying, and modernizing the law governing commercial transactions, (b) permitting the continued expansion of commercial practices through custom, usage, and agreement of the parties, and (c) making uniform the law among the various jurisdictions. Thus, while generally applicable principles of law and equity can be used to supplement the UCC, they may not be used to supplant the UCC's provisions or the purposes or policies these provisions reflect.

Courts determining whether common-law or other non-UCC claims and remedies have been displaced by the UCC have emphasized the policies favoring certainty and uniformity. Thus, the prevailing view now is that when the UCC provides a comprehensive remedy for the parties to a transaction, common-law and other non-Code claims and remedies should be barred.

*C-Wood Lumber Co. v. Wayne Cty. Bank*, 233 S.W.3d 263, 280–81 (Tenn. Ct. App. 2007) (citations omitted).

The *C-Wood Lumber* court went on to apply that "prevailing view" to determine whether Articles 3 and 4 displaced common-law remedies. *Id.* at 281. The court noted that the "delicately balanced statutory scheme" embodied in Articles 3 and 4 is not comprehensive, but "it is nearly so." *Id.* It further instructed that "courts dealing with 'hard cases' should be hesitant to recognize common-law or non-UCC remedies in the mistaken belief that they are dealing with one of the rare transactions not covered by the UCC." *Id.* Finally, it observed that "[t]he weight of the case law comes down against permitting common-law actions to displace the UCC's provisions regarding transactions governed by Articles 3 and 4." *Id.* The court concluded that the plaintiff's claims against the defendant in that case "f[e]ll squarely within the scope of Articles 3 and 4," and the plaintiff's remedies were therefore "governed solely by the UCC." *Id.* at 281–82.

Plaintiff's argument against UCC displacement as to Article 2 of the Tennessee UCC is that *C-Wood Lumber* is "limited" to Articles 3 and 4. (Doc. 28 at 10.) It is true that the holding of *C-Wood Lumber* as to displacement of common-law claims only pertained to Articles 3 and 4. *C-Wood Lumber*'s general principles, however, were neither expressly nor impliedly limited to those Articles. The Court of Appeals for the Sixth Circuit, in fact, has applied them to Article 4A of the Tennessee UCC, relying in part on the reasoning of *C-Wood Lumber*. *Wright v. Citizen's Bank of E. Tenn.*, 640 F. App'x 401, 405–07 (6th Cir. 2016).

The stated purposes and policies of the Tennessee UCC of promoting simplicity, clarity, and uniformity in transactions apply just as much to Article 2 as to Articles 3, 4, and 4A, where displacement has already been found. *See* Tenn. Code Ann. § 47-1-103(a). Like Articles 3, 4, and 4A, Article 2 of the Tennessee UCC sets out "a comprehensive remedy for the parties to a transaction." *See C-Wood Lumber*, 233 S.W.3d at 281. Part 7 of Article 2 contains multiple provisions governing the remedies available to sellers and buyers, including the remedies available to sellers who, like Plaintiff, allege a buyer failed to make a payment when due. *See* Tenn. Code Ann. § 47-2-703. Plaintiff identifies no fault or omission in the scheme of remedies Article 2 gives to sellers and buyers. And while Jonber points out that other jurisdictions have applied UCC displacement to Article 3, *see, e.g.*, *Rector v. Karlstad Farmers Elevator*, No. A07—693, 2008 WL 3287910, at *2 (Minn. Ct. App. Aug. 12, 2008), Plaintiff fails to point to any case in which a court has held that Article 2 does not displace common-law remedies.

Plaintiff argues that even if the Court concludes the UCC bars its negligence claim, it should still be allowed to plead negligence as an alternative theory of liability. (Doc. 28 at 10.) Plaintiff cites *In re Nissan North America, Inc. Odometer Litigation*, 664 F. Supp. 2d 873, 894–95

(M.D. Tenn. 2009), which held that a claim for unjust enrichment could survive a motion to dismiss as an alternative theory to breach of express warranty, despite the fact that the plaintiff would not ultimately be able to recover on both theories. Alternative pleading and the eventual requirement to elect between remedies, however, is a different situation than displacement of common-law claims by the UCC. *Nissan* addressed only the former, not the latter.

Finally, the Court notes that it has reviewed the opinion of the Court of Appeals for the Sixth Circuit in the factually similar case of *Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc.*, 759 F. App'x 348 (6th Cir. 2018). In that case, the appeals court confirmed that principles taken from UCC Article 3 should be applied when determining who should bear loss attributable to a third-party hacker. *See Beau Townsend*, 759 F. App'x 348 at 357, 359.

The Court concludes that Article 2 of the Tennessee UCC displaces the common-law tort remedy Plaintiff seeks against Jonber. Plaintiff's tort claim against Jonber will be **DISMISSED**.

## C. Tort Claims Against H&S Bakery

H&S Bakery argues there are no plausible allegations in the Complaint that H&S Bakery, as a non-party to the contract, had a duty to Plaintiff regarding payment for the April Purchases or caused any damages to Plaintiff regarding the April Purchases. (*See* Doc. 23 at 22-23.) Plaintiff responds that individuals who were employees of both Jonber and H&S Bakery were responsible for the wire transfer, and Plaintiff has accordingly stated a claim against H&S Bakery for negligence.

Plaintiff argues in its response that "RBF only communicated with employees of H&S Bakery regarding the wire transfer and the Purchase Documents were only signed by employees of H&S Bakery." (Doc. 28 at 3.) These assertions, however, are contradicted by the Complaint

and its attachments. Trewyn's own April 2, 2018 letter regarding splitting the forty-eight-truck transaction into two twenty-four-truck transactions was addressed to "Mr. Chuck Paterakis" at "H&S Distribution, LLC," not H&S Bakery. (Doc. 1-4.) Plaintiff prepared the first versions of the Purchase Documents with H&S Distribution as the buyer, not H&S Bakery.[6] (Doc. 1 ¶¶ 16, 17, 22, 25–26.) Each one of the operative Bills of Sale and the other Purchase Documents was signed by Paterakis on behalf of Jonber, not on behalf of H&S Bakery. (Doc. 1-2 [April Purchase Documents].) And ultimately, as discussed above, Jonber was the only purchasing entity; H&S Bakery was not involved. *See Creelgroup, Inc.*, 518 F. App'x at 347 (where a written instrument attached to a pleading contradicts allegations in the pleading, a court must credit the instrument, rather than the allegations). As a result, the Court agrees with the argument by H&S Bakery that, under these facts, it was a non-party to the contract, and had no duty to Plaintiff regarding payment for the April Purchases.

Plaintiff's tort claim against H&S Bakery will be **DISMISSED**.


## IV. CONCLUSION

The Court will **GRANT** Defendants' motion for partial dismissal (Doc. 22) and **DISMISS** both of Plaintiff's claims against H&S Bakery and Plaintiff's negligence claim against Jonber.

**An appropriate order will enter.**

/s/_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

---

[6] *See supra*, note 4.